IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


THE CINCINNATI INSURANCE COMPANY,  :    CIVIL ACTION
                                   :    NO. 10-4960
          Plaintiff,               :
                                   :
     v.                            :
                                   :
PPL CORPORATION, et al.,           :
                                   :
          Defendants.              :

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                          OCTOBER 25, 2013


**I. INTRODUCTION**


        Plaintiff the Cincinnati Insurance Company
("Plaintiff") brought this subrogation action seeking damages
from PPL Corporation, PPL Electric Utilities Corporation, and
PPL Energyplus, LLC (collectively "Defendants").  Plaintiff's
Complaint pleads three counts: (1) negligence; (2) strict
liability; and (3) breach of contract.  Compl. ¶ 18-38, ECF No.
1.

        Plaintiff's Complaint arises from an electrical
incident on September 29, 2008 that caused damage to Wright
Veterinary Medical Center, P.C. ("Wright").  Plaintiff insured
Wright, the building it occupied, its business property, and
business interests against loss pursuant to an insurance policy

(the "Policy").  Id. ¶ 10.  Wright purchased its electricity from Defendants.[1]  Answer ¶ 11, ECF No. 10; see also Compl. ¶ 11. Defendants, along with their various contractors and subcontractors, installed, maintained, owned, and operated equipment necessary for delivery of electricity to Wright according to the terms of the sale of electricity.  Answer ¶ 12; see also Compl. ¶ 12.  On September, 29, 2008, a transformer malfunctioned.  Compl. ¶ 14.  The malfunction caused a severe fluctuation in the power supply to Wright causing a fire and other extensive damage to Wright's building and property.  Id. ¶ 13, 15.  Additionally, Plaintiff claims that Wright suffered lost profits from the resulting loss of business.  Id. Plaintiff claims that for losses stemming directly from the September 29, 2008 incident, and pursuant to the Policy, Plaintiff made payments to Wright in the amount of $805,559.08. Compl. ¶ 16.

Pending before the Court is Plaintiff's Motion for Partial Summary Judgment ("Motion").  ECF No. 37.  Plaintiff contends that, under Pennsylvania law, the sale of electricity is subject to strict liability under Section 402A of the Restatement (Second) of Torts.  Id. ¶ 26-28; see also Schriner

---

[1]      Specifically, Wright purchased its electricity from PPL Electric Utilities Corporation.

v. Pennsylvania Power & Light Co., 501 A.2d 1128, 1134 (Pa.
Super. Ct. 1985) (holding that utility will be held to strict
liability, under certain circumstances, for sale of
electricity).  For the reasons that follow, the Court will grant
Plaintiff's motion as to Count II (strict liability).

II.  **BACKGROUND**[2]

At all relevant times and specifically on September
29-30, 2008, Wright operated a veterinary medical center at 3247
Wimmer Road, Bethlehem, PA.[3]  Defs.'s Resp. Pl.'s Mot. Partial
Summ. J. 1, ECF No. 49-2.  Plaintiff insured Wright medical
center pursuant to the terms of the Policy.  See id.  "Wright
was a customer of Defendant[s] . . . and [they] provided
electric power service to Wright."  Id. at 2.  The electric
power which Defendants provided to Wright passed through a
single-phase 100KVA transformer owned and operated by Defendants

---

[2]    In accordance with the appropriate standard of review,
see infra, Part III, the Court views the facts in the light most
favorable to the non-moving party.  As Plaintiff is the moving
party, the Court will construe the facts in the light most
favorable to Defendants.

[3]    Wright operated a veterinary medical center at that
location for many years prior to that time and still operates a
facility there today.

and manufactured by the McGraw-Edison Company.[4]  The transformer
contains "three leads that connect two hot leads and a neutral
from the transformer's interior to the exterior."  Id.  The
neutral is designed to "carry unbalanced current" to "keep the
voltage stabilized and balanced".  Id.  The two "hot leads"[5]
"have their alternating currents flowing in opposite directions
(reversing 120 times per second for 60-cycle power) so that the
current goes back and forth at the same instant but in opposite
directions."  Pl.'s Mot. Partial Summ. J., Ex. 8, Fire
Investigation Report of John F. Goetz, CFI 5-6, July 26, 2012,
ECF No. 44-7 (citing NFPA 921, Guide for Fire & Explosion
Investigations § 8.3.2.1 (2008 ed.)).  The "voltage between
either of the [hot leads] and the [neutral] is 120v," while the
"voltage between the two [hot leads] is 240v."  Id. at 6 (citing
NFPA 921 § 8.3.2.1.).  After passing through the transformer,
the electric power passes though Wright's meter and is then used
by Wright.

On the night of September 29, 2008, a problem
developed with the neutral, which the parties refer to as a

_____

[4]      Cooper Power Systems, LLC ("Third-Party Defendant") is
the successor in interest to McGraw-Edison.  See Third-Party
Answer 2, ECF No. 24.

[5]      The "hot leads" (insulated conductors) are also
referred to as hot legs or phases.

"floating neutral" or a "break at the neutral connection."[6]  See Defs.'s Resp. Pl.'s Mot. Partial Summ. J. 2; see also Report of Mr. Goetz 6.  A "floating neutral creates uneven voltage to power supply for a structure" and the "higher voltage can overheat or burn out some equipment and the lower voltage can damage some electronic equipment."  Report of Mr. Goetz 6, (citing NFPA 921 § 8.5.2).  Following the break in the neutral, the voltages on the hot leads on either side of the transformer became unbalanced."  Defs.'s Resp. Pl.'s Mot. Partial Summ. J. 2.  Prior to disconnecting the Transistor, a PPL troubleman (Raymond Bringhurst) measured the voltage as 215 volts on one hot lead and 40 volts on the other and recorded his measurement by writing on the transformer itself.  See Pl.'s Mot. Partial Summ. J., Ex. 8, Report of Robert A. Neary, P.E., C.F.E.I. fig. 3, August 15, 2012, ECF No. 44-6 (displaying writing on transformer); see also Defs.'s Resp. Pl.'s Mot. Partial Summ. J. 2 ("the voltage output was measured to be 215 volts on one hot lead and 40 volts on the other lead").

---

[6]     Defendants allege in their Third-Party Complaint that any failure in the transformer occurred due to a manufacturing defect on the part of McGraw-Edison, and thus liability lies with Third-Party Defendant.  See Third-Party Compl. ¶ 5, ECF No. 11.  Defendants subsequently filed a Motion for Summary Judgment as to Third-Party Defendant (ECF No. 48).  The Court has denied that motion in a separate order (ECF No. 54).  For the purposes of the motion sub judice, the Court need not determine if the failure in the transformer was due to a manufacturing defect or was the fault of Defendants.

When the electrical malfunction began, the initial indication of a problem was, according to Plaintiff, that an ultrasound machine at the veterinary facility began smoking and making "terrible electrical noises." See Pl.'s Mot. Partial Summ. J., Ex. 3, Dr. Patrick Thomas Wright Dep. 90:13-91:9, Apr. 17, 2012, ECF No. 44-4.  Wright employees contacted the fire department who responded to the fire at around 11:00 p.m. and then, after determining there was no fire, left around 11:22 p.m.  Id. at 91:7-91:24; see also Pl.'s Mot. Partial Summ. J., Pl.'s Statement of Uncontested Material Facts ¶ 8-9, Nov. 16, 2012, ECF No. 44-3.

The problem continued after the fire department left. The owner of Wright's, Dr. Wright, arrived at the veterinary center.  He reported hearing a "loud shrieking sound" coming from the computer servers and noticed the lights were "becoming very dim and then very bright."  See Wright Dep. 32:19-33:19. Next, Dr. Wright claims that "all of a sudden the lights started to pop and there [were] popping noises."  Id. 33:15-16. Wright's electrical contractor, Richard Horvath, informed Dr. Wright via telephone to turn off every electronic device, unplug everything, shut off the circuit breakers, and tell everyone to leave the building.  Id. 33:16-19.  Mr. Horvath arrived approximately ten minutes later and discovered smoke in the building.  Pl.'s Statement of Uncontested Material Facts ¶ 14;

see also Pl.'s Mot. Partial Summ. J., Ex. 5, Richard S. Horvath
Dep. 53:15-25, Sep. 28, 2011, ECF No. 44-5.  Mr. Horvath then
called the fire department again.  Horvath Dep. 53:19-56:11.
The fire fighters returned to the veterinary clinic and found a
fire burning on top of a wooden bookshelf in a second floor
office.  Pl.'s Statement of Uncontested Material Facts ¶ 15;
(citing Pl.'s Mot. Partial Summ. J., Ex. 4, Bernard Roecker,
Fire Marshall Dep. 56:1-25, Apr. 17, 2012, ECF No. 44-5).  The
fire fighters extinguished the fire.  Id.

     Shortly thereafter, Defendants dispatched a
troubleman, Ray Bringhurst, to the site.  See Pl.'s Mot. Partial
Summ. J., Ex. 6, Ray Bringhurst,  Dep. 90:13-91:9, Apr. 17,
2012, ECF No. 44-5.  Mr. Bringhurst conducted an investigation
and determined that a malfunction with the transformer was
causing the electrical problems.  Id. 41:13-45:24.  To confirm
his suspicions, Mr. Bringhurst inspected the transformer and
tested the voltage output.  Id. 58:3-61:22.  His test of the
voltage revealed that the voltage was imbalanced with over 200
volts on one phase and 40 volts on the other.  Id. 58:18-61:3.
He recorded his results on the transformer and marked his
readings as "215v on 1 leg 40v on the other."  Report of Mr.
Neary, fig. 3.

     In a subsequent investigation, Plaintiff's expert, Mr.
Goetz and the local fire marshal determined that the power surge

7

from the malfunctioning transformer caused the fire in the
Wright facility and the damage to the electrical equipment.  See
Report of Mr. Goetz 6; see also Roecker Dep. 104:16-105:17.
Defendants' experts do not dispute that the imbalance of voltage
put out by the transformer caused both the fire and the damage
to the electrical equipment.  Notably, Defendants' electrical
engineering expert, Allan Magee, P.E., states in his conclusion
that:

> Due to the fact that the clinic reported electrical
> problems at the facility immediately before the fire,
> the circumstances of the fire are consistent with an
> electrical failure, and that electrical items were
> found to have malfunctioned after the fire, it is my
> conclusion that fire and equipment damage were caused
> by the same event and were part of the same loss.

Pl.'s Mot. Partial Summ. J., Ex. 9, Report of Allan Magee 2,
P.E., Sep. 6, 2012, ECF No. 44-7.  Furthermore, "[t]he
transformer failed internally on the date of the loss, and the
failure was a direct cause of the loss."  Id. at 5.

Plaintiff subsequently compensated Wright pursuant to
the policy.  Compl. ¶ 16.

## III. STANDARD OF REVIEW

Summary judgment is appropriate if there are no
genuine disputes of material fact and the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).
"A motion for summary judgment will not be defeated by 'the mere
existence' of some disputed facts, but will be denied when there
is a genuine issue of material fact."  Am. Eagle Outfitters v.
Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).
A fact is "material" if proof of its existence or non-existence
might affect the outcome of the litigation, and a dispute is
"genuine" if "the evidence is such that a reasonable jury could
return a verdict for the nonmoving party."  Anderson, 477 U.S.
at 248.

In undertaking this analysis, the Court views the
facts in the light most favorable to the non-moving party.
"After making all reasonable inferences in the nonmoving party's
favor, there is a genuine issue of material fact if a reasonable
jury could find for the nonmoving party."  Pignataro v. Port
Auth. of N.Y. & N.J., 593 F.3d 265, 268 (3d Cir. 2010) (citing
Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir.
1997)); see also Kelly v. Ziolko 734 A.2d 893, 899 (Pa. Super.
Ct. 1999) (citations omitted).  While the moving party bears the
initial burden of showing the absence of a genuine issue of
material fact, meeting this obligation shifts the burden to the
non-moving party who must "set forth specific facts showing that
there is a genuine issue for trial."  Anderson, 477 U.S. at 250.

In a diversity case, when faced with a motion for summary judgment, the federal courts follow federal law on issues of procedure but apply the substantive rule of decision from state law.  See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Garcia v. Plaza Oldsmobile Ltd., 421 F.3d 216, 219 (3d Cir. 2005).

## IV.  DISCUSSION

The Court must first determine whether a genuine dispute of material fact exists.  If there is no genuine dispute of material fact, the Court must then determine if the Superior Court's holding in Schriner, applying strict liability to the sale of electricity, should be applied to the present case.  See Schriner, 501 A.2d at 1134.

### A.   No Genuine Dispute of Material Fact

As to those facts necessary to decide the motion sub judice, there is no genuine dispute of a material fact.  While Defendants may contest what caused the failure in the transformer, they do not contest that they owned and controlled the transformer, there was a failure in the transformer, the failure caused the voltage to fluctuate outside of an acceptable

range, and the fluctuation in voltage caused the damage to Wright.  Furthermore, Defendants do not dispute the existence of the insurance policy, that payment was made pursuant to the policy, or that Plaintiff was entitled to bring a subrogation action.  In their response to Plaintiff's Motion for Partial Summary Judgment, Defendants state "[f]actual and legal issues prevent the entry of summary judgment in favor of Plaintiff."  Defs.'s Resp. Pl.'s Mot. Partial Summ. J. 3.  Upon examining the Defendants' actual arguments, however, the Court finds that the Defendants do not actually dispute any of the facts material to deciding the present motion.

B.   <u>Plaintiff is Entitled to Judgment as a Matter of Law</u>

1. <u>Under Pennsylvania Law, the Sale of Electricity Is Subject to Strict Liability</u>

In 1966, the Pennsylvania Supreme Court adopted Section 402A of the Restatement (Second) of Torts as the law of Pennsylvania.  <u>Webb v. Zern</u>, 220 A.2d 853, 854 (Pa. 1966).  The language, as adopted by the Pennsylvania Supreme Court, provides:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm

thereby caused to the ultimate user or consumer, or to
his property, if
    (a) the seller is engaged in the business of
    selling such a product, and
    (b) it is expected to and does reach the
    user or consumer without substantial change
    in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
    (a) the seller has exercised all possible
    care in the preparation and sale of his
    product, and
    (b) the user or consumer has not bought the
    product from or entered into any contractual
    relation with the seller.

Id. (citing Restatement (Second) Torts § 402A (1965)).

Nearly two decades later, the Pennsylvania Superior
Court held, as a matter of Pennsylvania law, § 402A applies to
the sale of electricity. Schriner, 501 A.2d at 1134. To reach
that determination, the Superior Court separated § 402A into its
component elements: (1) a product; (2) a sale of that product;
(3) a user or consumer; (4) a defective condition, unreasonably
dangerous; and (5) causation (product caused physical harm to
user or property). Id. at 1132. The Pennsylvania Superior
Court held that "electricity can be a 'product' within the
meaning of § 402A." Id. at 1133.[7]

---

[7]    The Superior Court cited to an earlier holding by the
Wisconsin Supreme court in Ransome v. Wisconsin Electric Power
Company. 275 N.W.2d 641, 643 (1979) ("While there probably are
numerous technical definitions of 'electricity,' we need not be
concerned with those accurate descriptions here suffice it to
say it is a form of energy that can be made or produced by men,
confined, controlled, transmitted and distributed to be used as
an energy source for heat, power and light and is distributed in

To determine when a "sale" of electricity has occurred the Superior Court stated that "entry of electricity into the stream of commerce has been deemed to occur, generally, when the electricity leaves the transmission lines and passes through the customer's meter." Id. (citations omitted).  In short "while still in the distribution system, electricity is a service, not a product; electricity only becomes a product, for purposes of strict liability, once it passes through the customer's meter and into the stream of commerce." Id. (citing Smith v. Home Light and Power Company, 695 P.2d 788 (Colo., 1984).

> Accordingly, the Superior Court held that if electricity "in a defective condition, unreasonably dangerous" passes through the meter of a user or consumer and into the stream of commerce, causing physical harm to the ultimate user or consumer, or to his property, the doctrine of strict liability in tort may be applied against the public utility which "engaged in the business of selling such a product," which product "[was] expected to and [did] reach the user or consumer without substantial change in the condition in which it was sold."

Id. at 1134 (citing § 402A).

The Pennsylvania Supreme Court has not, as of yet, weighed in on this issue.  Accordingly, Defendants ask the Court not to apply Schriner.  Defs.'s Resp. Pl.'s Mot. Partial Summ. J. 5 (citing Blake v. Kline, 612 F.2d

the stream of commerce. The distribution might well be a service, but the electricity itself, in the contemplation of the ordinary user, is a consumable product.").

718 (3d Cir. 1979)).  In Blake, the Third Circuit stated that
"although a federal court in a diversity suit may not ignore a
decision of an intermediate state court as to matters of state
law, it is not bound by it, if after analysis it believes the
state's highest court would hold otherwise."  Blake, 612 F.2d at
723.  Defendants, however, do not provide a persuasive reason
why the Court should find that the Supreme Court of Pennsylvania
would hold otherwise.  Schriner was decided nearly thirty years
ago, and it continues to be applied as Pennsylvania law.  See
State Farm Fire & Cas. Co. v. PECO, 54 A.3d 921, 930 (Pa. Super.
Ct. 2012) ("Because we have previously held that a party may
pursue a strict liability claim against an electricity provider,
. . . the inquiry turns to whether the utility has disclaimed
that form of liability.") (citing Schriner, 501 A.2d at 1134).
Accordingly, the Court will apply Schriner as substantive state
law.  See Erie, 304 U.S. at 78; Garcia, 421 F.3d at 219.


2. Schriner Is Applicable to the Present Motion


        Given that the facts as set out in Section II, supra,
are not genuinely in dispute and Schriner correctly states
Pennsylvania law, the Court will next determine if strict
liability should apply in the present situation.  Accordingly,
the Court will now determine if electricity in a defective

condition, unreasonably dangerous, passed through Wright's meter causing physical harm to its property.  _Schriner_, 501 A.2d at 1134 (citing § 402A).  If so, then the doctrine of strict liability in tort will be applied against Defendants as a public utility engaged in the business of selling electricity which was expected to and did reach Wright without substantial change in the condition in which it was sold.  _Id._ (citing § 402A).

To reach this determination, the Court will apply the § 402A elements as explained in _Schriner_:(1)a product; (2) a sale of that product; (3) a user or consumer; (4) a defective condition, unreasonably dangerous; and (5) causation (product caused physical harm to user or property).  _Schriner_, 501 A.2d at 1132.  As will be explained below, all _Schriner_ elements are satisfied in this case.

i. Product

The _Schriner_ court explained that electricity is a product "once it passes through the customer's meter."  _Id._ at 1133-34.  ("electricity only becomes a product, for purposes of strict liability, once it passes through the customer's meter and into the stream of commerce." (citing _Smith v. Home Light and Power Company_, 695 P.2d 788 (Colo. 1984))).

15

Defendants do not dispute that the electricity passed
through Wright's meter.  See, e.g., Defs.'s Resp. Pl.'s Mot.
Partial Summ. J. 6 ("It was only after this point that the
electricity was permitted to reach Wright's facility in its
unbalanced condition.").  Defendants instead argue that the
electricity was not a product, but rather a service, because
"[w]hile being transmitted, liability is controlled by standards
of negligence and not strict liability, since any injury
sustained as a result thereof is causally connected only to the
transmission or transportation service and is unrelated to the
ultimate sale of the product"[8] and since the malfunction occurred
at the transformer it occurred while in transmission.  Defs.'s
Resp. Pl.'s Mot. Partial Summ. J. 6 (emphasis omitted) (citing
Schriner, 501 A.2d at 1133).

Defendants' proffered standard of "negligence" is
inapplicable because the harm caused to Wright happened
following the sale of electricity and not during the
transmission.  To illustrate what the Superior Court meant by
"connected only to the transmission or transportation"

---

[8]     Defendants omit important language that puts their
cited text into conext: "[t]he transmission of electricity, as
well as the transmission of other similar type consumable goods,
is a service being rendered by the utility to prospective
purchasers."  Schriner, 501 A.2d at 1134 (citing Aversa v.
Public Service Electric and Gas Co., 451 A.2d 976, 979 (N.J.
1982)).  Given that Wright was an actual purchaser and not a
"prospective purchaser," the language is clearly inapplicable

(Schriner, 501 A.2d at 1133) of electricity the Court will examine Smithbower v. Sw. Cent. Rural Elec. Co-op., Inc., 542 A.2d 140 (Pa. Super. Ct. 1988).  In Smithbower, three individuals were electrocuted when their portable grain auger came into contact with a high voltage power line.  Id. at 141. The court held that strict liability did not apply because the electricity was deemed still in transit and thus a service rather than a product.  Accordingly, the Superior Court explained that the electricity

> had not yet been placed into the stream of commerce
> since it had not yet passed through the meter at the
> Varner farm. Although a sale of electricity took place
> between Pennsylvania Electric and Southwest Central,
> we find that, because the electricity had not yet left
> the transmission lines, a sale of the electricity as a
> 402A product had not occurred.  We agree with the
> trial court that since the "sale" requirement under
> Restatement (Second) of Torts § 402A had not been
> completed in the instant case, strict liability cannot
> be imposed. However, general concepts of negligence
> are still applicable.

Id. at 143-44 (some internal citation omitted).  Hence, the concept of power being in transit, and thus a service rather than a product, is inapplicable to the present case because the electricity passed through Wright's meter.  The harm to Wright happened after the electricity was delivered to Wright and not during its transmission through the power lines.

Accordingly, the electricity in the current matter is a product for the purposes of § 402A.

ii. Sale of that Product

The Schriner court explained that once the electricity has passed through the meter, the sale has occurred.  Schriner, 501 A.2d at 1133-34.  Defendants do not dispute that the electricity passed through Wright's meter.  See, e.g., Defs.'s Resp. Pl.'s Mot. Partial Summ. J. 6.  Accordingly, the Court finds that a sale occurred.

Defendants make several arguments which the Court construes as attempting to negate the "sale" prong of the Schriner test.  First, Defendants assert Schriner's requirement that the "electricity must have been 'expected to and [must have] reach[ed] the user or consumer without substantial change in the condition in which it was sold'" was not met because "the electricity in question was not at the proper voltage due to a malfunction at the transformer's neutral connection."  Defs.'s Resp. Pl.'s Mot. Partial Summ. J. 5 (citing Schriner, 501 A.2d at 1134).

Defendants entirely miss that the point of sale occurs when the electricity passes through the meter, and the electricity passed through the transformer before it reached the meter.  Schriner, 501 A.2d 1133.  The failure at the neutral connection, which caused the imbalance of voltage, did not occur

18

after the electricity was sold and therefore cannot be a substantial change in the condition in which it was sold. Defendants claim that this change "obviously occurred after the electricity left Defendants' transmission facility," but Defendants fail to grasp that the sale does not occur when the electricity leaves the transmission facility (and they do not point to any case law to suggest such).  Defs.' Resp. Pl.'s Mot. Partial Summ. J. 6.  Further, the electricity was under Defendants' control when it went through the transformer, and the transformer was owned, installed, and operated by Defendants.

Second, Defendants claim that "the electricity in question was not sold by Defendants.  Simply stated, Defendants do not sell surges of electricity."  Defs.' Resp. Pl.'s Mot. Partial Summ. J. 7.  This argument is nearly frivolous.  One, Pennsylvania law has made it clear that "surges" of electricity are covered by its holding in Schriner.  See State Farm, 54 A.3d at 923 (applying 402A to "a 'dangerous and defective' surge of electricity [that] passed though the subrogors' home electric meters and caused significant damage to their houses.").  Two, under 402A, it is not required that the defendant knowingly sell a defective product.  That is in fact the very point of strict liability.  The focus is not on the conduct of the defendant but on whether the product was actually defective.  Third, and

finally, it is undisputed here that the Defendants actually sold the electricity to Wright.

### iii. User or Consumer

Defendants concede that Wright was "a customer" of Defendants and thus a consumer of their product.  Defs.'s Resp. Pl.'s Mot. Partial Summ. J. 2. ("On September 29-30, 2008, Wright was a customer of [PPL] and Defendants provided electric power to Wright.").  Accordingly, this element is met.

### iv. Defective Condition, Unreasonably Dangerous

Notably, Defendants concede that the electricity was in a defective state when it reached Wright.  See, e.g., Defs.'s Resp. Pl.'s Mot. Partial Summ. J. 2.  Additionally, Defendants do not argue that the electricity itself was not unreasonably dangerous.  Such an imbalance of voltage is dangerous because, as it occurred in thos case, the "higher voltage can overheat or burn out some equipment and the lower voltage can damage some electronic equipment."  Report of Mr. Goetz 6 (citing NFPA 921 § 8.5.2).

> v. Causation (Product Caused Physical Harm to
> User or Property)

Defendants' troubleman, Mr. Bringhurst made an initial
determination that the electricity supplied by Defendants was
causing the electrical problems due to a malfunction with the
transformer that was causing the voltage to be imbalanced with
over 200 volts on one phase and 40 volts on the other.  See
Bringhurst Dep. 41:13-45:24, 58:18-61:3; see also Report of Mr.
Neary, fig. 3 (showing Mr. Bringhurst's markings on the
transformer).  Plaintiff's expert and the local fire marshal
both found that the imbalanced voltage caused the fire and the
other damage.  See Report of Mr. Goetz 6; see also Roecker Dep.
104:16-105:17.  Even Defendants' own expert concludes that the
imbalance of voltage in the electricity supplied by Defendants
was the cause of the loss.  See Report of Mr. Magee 2, 9.

Defendants claim that the faulty transformer was the
cause of the damage and not the electricity.  In State Farm, the
Superior Court of Pennsylvania held causation for the damage
could apply even where "the surge came from a bolt of lightning
that struck a PECO facility and affected many residences in the
subrogors' area."  State Farm, 54 A.3d at 923; id. at 931
(reversing trial court's decision that the plaintiff could not
pursue a strict liability claim due to tariff disclaimers).  It

is thus clear that, although a faulty transformer contributed to, or caused, the imbalanced voltage to be delivered; it was still the electricity itself that caused the damage.

It should also be noted that the Pennsylvania Supreme Court has "long held that a defendant is not relieved from liability because another concurring cause is also responsible for producing injury. . . . Where a jury could reasonably believe that a defendant's actions were a substantial factor in bringing about the harm, the fact that there is a concurring cause does not relieve the defendant of liability." Powell v. Drumheller, 653 A.2d 619, 622 (Pa. 1995) (citing Jones v. Montefiore Hospital, 431 A.2d 920, 923 (Pa. 1981); Hamil v. Bashline, 392 A.2d 1280, 1284 (Pa. 1978)).  That Third-Party Defendant could also be held liable does not relieve Defendants of liability.  Under Pennsylvania law "[p]roximate cause is a term of art, and may be established by evidence that a defendant's negligent act or failure to act was a substantial factor in bringing about the harm inflicted upon a plaintiff. Pennsylvania law has long recognized that this substantial factor need not be . . . the only factor." Jones, 431 A.2d at 923 (emphasis in original).

Furthermore, the Pennsylvania Supreme Court has held that the purpose of strict liability is to place the responsibility on those who intend that products go into the

market place and thus protect the public.  In <u>Franconi v. Gibsonia Truck Corp.</u>, 372 A.2d 736 (Pa. 1997), the Pennsylvania Supreme Court explained that "public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market."  <u>Id.</u> at 738(quoting <u>Escola v. Coca Cola Bottling Co. of Fresno</u>, 150 P.2d 436, 440 (Cal. 1944)).  "[B]y the adoption of Section 402A, that responsibility was placed on those who, through manufacturing and distribution, intend that products 'reach the market.'"  <u>Id.</u> (citing <u>Bialek v. Pittsburgh Brewing Co.</u>, 242 A.2d 231, 236 n. 2 (Pa. 1968); Restatement (Second) of Torts § 402A cmts. c, f).  Defendants fall squarely within the category of those who intend their product (electricity in this case) to go into the market place.[9]

       As a result, all five elements of <u>Schriner</u> are satisfied and the defendant is subject to strict liability because electricity in a defective condition, unreasonably dangerous, passed through Wright's meter causing physical harm to its property.

_____

[9]       As explained above, the dispute between Defendants and Third-Party Defendant as to whether the malfunction was due to a manufacturing defect does not control the Motion.

**V.    CONCLUSION**


For the reasons set forth above, the Court finds that there is no genuine dispute of a material fact and that the Plaintiff is entitled to partial summary judgment on the issue of strict liability as a matter of law.

An appropriate order follows.